IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BARBARA A. LANE, | ) | Case No. 3:20-cv-1105 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Barbara A. Lane, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C.

§ 405(g) and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper

legal standards and reached a decision supported by substantial evidence, I recommend that the

Commissioner's final decision denying Lane's application for DIB be AFFIRMED.

I.    **Procedural History**

Lane applied for DIB on June 15, 2017.  (Tr. 225-26).[1]  Lane alleged that she became

disabled on January 1, 2016, due to: "1. Type 2 Diabetes; 2. High Blood Pressure; 3. High

Cholesterol; 4. Arthritis; 5. Asthma (w) Albuteral [*sic*] and Nebulizuer [*sic*]; 6. Bipolar; 7. Sleep

Apnea (w) Cpap; 8. Hearing Loss (w) hearing Aids; 9. depression; 10. fat tumor."  (Tr. 225,

243).  The Social Security Administration denied Lane's application initially and upon

---

[1] The administrative transcript is in ECF Doc. 12.

reconsideration.  (Tr. 111-147).  Lane requested an ALJ hearing.  (Tr. 169-70).  ALJ Terry M. Banks heard Lane's case on February 4, 2019 and denied the claim in an April 18, 2019 decision. (Tr. 10-23, 75-110).  On March 17, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On May 20, 2020, Lane filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Lane was born on December 3, 1963, and she was 52 years old on the alleged onset date. (Tr. 225).  She got her general equivalency diploma in 1992, and she studied to be a parole officer for two quarters at Terra Tech without completing the program.  (Tr. 244, 863).  While in school, Lane mostly got "As," but she had an individualized education program for reading and writing.  (Tr. 863).  Lane's date last insured was September 30, 2017.  (Tr. 12).  Lane had past relevant work as a hand packager, fast-food worker, and fast-food manager.  (Tr. 83-84, 105, 863).

### B.     Relevant Medical Evidence

#### 1.     Medical Evidence Through September 30, 2017

On January 8, 2015, Lane had left heart catheterization and a coronary angiogram to evaluate her non-obstructive coronary artery disease.  (Tr. 521-22).

On January 27, 2015, Lane reported congestion, progressive back pain, knee arthritis, and trouble with steps to Perry Hux, MD.  (Tr. 631).  Dr. Hux noted that Lane had chronic hypertension and diabetes, but her daily living activities were good despite her conditions and pain.  (Tr. 631-32).  Examination showed normal heart rate and rhythm, no edema or tenderness,

no tremors, an ability to ambulate, and normal mood and affect. (Tr. 635). On August 4, 2015, Lane told Dr. Hux that she had incontinence and urinary urgency. (Tr. 649).

On October 16, 2015, Lane reported popping and pain in her left knee affecting ambulation and numb pain in her thigh that was worse with activity. (Tr. 659). Examination showed left knee crepitus with full range of motion, no effusion, tenderness to light palpation of the left thigh, and no weakness. (Tr. 661). Lane continued to have a normal heart rate and rhythm and a normal mood and affect. (Tr. 661). Dr. Hux diagnosed Lane with arthritis and meralgia paraesthetica. (Tr. 662). He prescribed Mobic and Norco. (Tr. 662).

On December 22, 2015, Lane reported left hip pain that caused trouble sleeping, said her knee was getting worse, said that medication didn't help, and said that she was avoiding narcotics. (Tr. 709). Physical examination showed tenderness (especially over the left trochanter area), no edema, good hip range of motion, normal heart rate and rhythm, and normal mood and affect. (Tr. 711). Dr. Hux diagnosed Lane with hip bursitis and referred her to orthopedic surgery. (Tr. 712).

From January 26, 2016, through January 26, 2017, Dr. Hux's examinations routinely showed that Lane had a normal heart rate and rhythm, no edema or tenderness, and an ability to ambulate, no tremors, and normal mood and affect. (Tr. 728, 743, 758-59, 782, 801). Lane also regularly denied having any cardiovascular or musculoskeletal symptoms. (Tr. 743, 781, 800). On January 26 and April 26, 2016, Dr. Hux noted that Lane's pain issues were well-controlled, and her medications helped. (Tr. 726, 741). But on January 26, 2016, Lane had decreased range of motion in her back and she was unable to get orthopedic surgery because she owed money. (Tr. 726, 728). On April 26, Dr. Hux noted that Lane wasn't sleeping, asked for trazodone, and endorsed feeling nervous, anxious, and dysphoric. (Tr. 741). On July 26, 2016, Dr. Hux noted

3

that Lane had reduced function due to back issue sand leg weakness and neuropathy, and Lane endorsed arthralgias, back pain, and myalgias.  (Tr. 756, 758).  Dr. Hux noted, however, that Lane had a good mood, improved blood sugar, and dealt well with family estate stressors.  (Tr. 756).  And on January 26, 2017, Dr. Hux noted that Lane's pain was stable, her medications helped, she endorsed being nervous/anxious, and she denied having decreased concentration. (Tr. 798, 800).

On February 3, 2016, Zoheir Abdelbaki, MD, noted that Lane's coronary artery disease seemed to be under good control, her diabetes was not very stable, her obesity required diet and weight control, and her hyperlipidemia was not well controlled.  (Tr. 398).  On examination, Lane had normal heart sounds with a slight murmur, no edema in her extremities, good peripheral pulses, no obvious musculoskeletal deformities, and no obvious neurological defects. (Tr. 398).  On February 8, 2017, Dr. Abdelbaki noted that Lane had limitations in ambulation, chest pressure, and dyspnea.  (Tr. 413).  Examination showed no obvious musculoskeletal deformities, no edema, good peripheral pulses, no obvious neurological deficits, normal heart sounds with a slight murmur, and clear lungs.  (Tr. 417).

Also, on February 8, 2017, Lane told Beverly Theis, CMA, that she had chest pain off and on, shortness of breath with over exertion, occasional swelling in her feet and ankles, heart palpitations even at rest, and lightheadedness when lying down.  (Tr. 418).

On February 14, 2017, Dr. Hux noted that Lane had good sugars, clear lungs, regular heart rate and rhythm without murmur, and recurrent bilateral nares sores.  (Tr. 813).  Dr. Hux diagnosed Lane with infectious rhinitis and prescribed Bactroban and Cleocin.  (813).

On February 17, 2017, Lane had a segmental pressure study.  (Tr. 476-77).  Raymond Decanio, MD, determined that pulse volume recording waveforms appeared somewhat

dampened bilaterally, which suggested mild peripheral vascular disease bilaterally. (Tr. 476-77). Dr. Decanio also noted that the results suggested the presence of arterial calcinosis that could be related to diabetes. (Tr. 477).

On April 20, 2017, Lane told Dr. Hux that she was having family issues, lost Medicaid and was off her medications for a while, had sugars ranging from 500 to 600, and felt terrible and dizzy. (Tr. 826). Dr. Hux noted that Lane had pain, that medications helped, that surgery would be needed when Lane got better coverage, and that Lane needed artery stents. (Tr. 826). Examination showed full orientation, normal range of motion in the neck, normal heart rate and rhythm, no edema or tenderness, ability to ambulate, no tremors, and normal mood and affect. (Tr. 829).

On July 11, 2017, Lane went to the cardiac center with dyspnea on exertion, chest pressure, and fatigue. (Tr. 594, 597). A stress test showed moderate ischemia and a left ventricular ejection fraction of 60%. (Tr. 597-98). Lane was directed to follow up with a cardiologist. (Tr. 598).

On July 27, 2017, Dr. Hux noted that Lane's lumbar pain and debility was unchanged, but she had pain management with ablation and fair functioning with medication. (Tr. 843). Dr. Hux noted that Lane had increased depression and poor tolerance of people, but she had less anger. (Tr. 843). Examination showed normal range of motion in the neck, normal heart rate and rhythm, no edema or tenderness, pain with lumbar range of motion, ability to ambulate, no tremors, depression, good interaction and logic, and no anger. (Tr. 846).

### 2.    Medical Evidence After the Date Last Insured – September 30, 2017

On October 11, 2017, Lane told Russell Johnson, DO, that she had fallen three weeks earlier and had pain in her right hip. (Tr. 1248). Lane said that she was able to walk, used

narcotics and ibuprofen for her pain, and used a cane for ambulation.  (Tr. 1248).  Lane said that she was able to stand and walk immediately after the incident and the bruising had cleared up.  (Tr. 1248).  Lane rated her pain as a 1 on a 10-point scale.  (Tr. 1249).  Examination showed normal range of motion, no edema, tenderness in the right hip, full orientation, normal mood and affect, and normal behavior.  (Tr. 1250-51).  An x-ray showed mild joint space narrowing, but there was no fracture, destructive lesion, or other acute finding.  (Tr. 1251).

From October 2017 through June 2018, Timothy Kistler, MD, treated Lane for long toenails, painful diabetic neuropathy, and onychomycosis after she had reported numbness, tingling, and burning in her right and left feet.  (Tr. 1140-49).

On October 27, 2017, Lane had a cardiac catheterization for her 85 percent distal right coronary artery stenosis.  (Tr. 899).  She was diagnosed with critical coronary artery disease, and angioplasty was recommended.  (Tr. 901).  On November 6, 2017, Mark Buettner, PA-C, performed a catheterization with stents.  (Tr. 1120-30).  At the follow-up, Lane told Buettner that she felt well overall, denied chest pain, denied shortness of breath, and denied palpitations.  (Tr. 1131).  Lane said that she had trouble staying awake and that she thought her Lopressor was the cause.  (Tr. 1131).  Examination showed normal functioning, good peripheral pulses, and no obvious musculoskeletal deformities.  (Tr. 1134).

On March 16, 2018, Lane had an MRI of her pelvis to assess her back lipoma and reports of right hip pain.  (Tr. 1100).  The MRI revealed symmetric prominence of the subcutaneous fat and "[m]oderate degenerative in the visualized lumbar spine."  (Tr. 1100).  Amad Al-Jaber, MD, determined that there was no definite mass in the area of concern.  (Tr. 1100).

In October 2018, Lane started mental health treatment with Maria Maxwell, LSW, at Firelands Counseling.  (Tr. 1348).  Lane's treatment focused generally on depression, fatigue,

6

anxiety, low motivation, trauma from abuse as a child, and family life stressors. (Tr. 1348-64). She was diagnosed with depression and PTSD. (Tr. 1353). Examinations during her counseling sessions showed no memory impairment, normal attention, no perception pathology, cooperative behavior, fair insight, and fair judgment. (Tr. 1357, 1363).

The record doesn't appear to include any treatment notes written by Kristina Knoll, APRN-CNP and the parties have not cited to any treatment notes by her. *See generally* (Tr. 40-74, 363-1404); ECF Doc. 14; ECF Doc. 16. Nevertheless, medical records reflect that Knoll began treating Lane as early as June 7, 2018. (Tr. 43-44). And, over the course of her treatment, Knoll noted Lane had coronary artery disease, diabetic polyneuropathy associated with type 2 diabetes mellitus, spinal stenosis, osteoarthritis of multiple joints, chronic narcotic use, lumbar spondylosis, ambulation with a cane, and vertigo. (Tr. 43-44).

### C. Relevant Opinion Evidence

#### 1. Treating Nurse – Kristina Knoll, APRN-CNP

On January 3, 2019, Knoll completed a "medical source statement," assessing both Lane's physical and mental conditions. (Tr. 1365-67). Knoll indicated that Lane would miss 5+ days of work per month due to her conditions. (Tr. 1365). She could never climb; infrequently stand, walk, and stoop, and occasionally sit. (Tr. 1365). She could lift up to 20 pounds infrequently and 5 pounds occasionally, but she could never lift more than 20 pounds. (Tr. 1365). Lane could frequently use her hands for gross or fine manipulation and infrequently raise her arms over her shoulders. (Tr. 1365). Lane had moderately severe pain, would need to elevate her legs above her waist when sitting, and would need to lie down "when necessary." (Tr. 1366). Knoll said that Lane used an assistive device to ambulate. (Tr. 1366). Lane's pain affected her sleep. (Tr. 1367).

Knoll said that Lane would be off task 60% of the workday.  (Tr. 1366).  Knoll indicated that Lane's pain medication would interfere with her ability to maintain focus and concentration (Tr. 1366), but also said that her conditions and medications would *not* cause any lapse in memory or concentration.  (Tr. 1367).  Knoll said that Lane could: (1) satisfactorily understand and remember very short and simple instructions; (2) occasionally understand and remember detailed instructions, perform activities within a schedule, maintain regular attendance, sustain an ordinary routine, and work in coordination or proximity to others without being distracted; and (3) frequently adapt to stress or changes in the work place and maintain attention and concentration for extended periods.  (Tr. 1366).  She had no limitation interacting with the general public, asking simple questions, responding appropriately to supervisor criticism, getting along with coworkers, maintaining socially appropriate behavior, or adhering to basic standards of neatness and cleanliness.  (Tr. 1366-67).  And she would need to take unscheduled breaks beyond those normally permitted in competitive work.  (Tr. 1367).

### 2. Consultative Examiner – Andria Doyle, Ph.D.

On October 3, 2017, Lane saw Andria Doyle, Ph.D. for a consultative examination to assess her mental health function.  (Tr. 862-70).  Lane indicated that she got along great with her former supervisors when she was a factory worker, but she believed she couldn't work anymore because she couldn't be on her feet.  (Tr. 863-64).  Lane also said that she had been fired in the past for missing work to take care of her father or get gall bladder surgery.  (Tr. 864).  Lane said that she cooked daily, grocery shopped twice a week, did laundry weekly, knew how to use a computer, bathed every other day, was able to manage her own medications, drove her own vehicle, and made floral arrangements for leisure.  (Tr. 866).  Lane told Dr. Doyle that she was diagnosed with bipolar disorder in the 1990s, and she had gone to counseling four times since

her early 30s.  (Tr. 864).  She said that she had crazy moods, daily depression, loss of interest/pleasure, excessive guilt, crying spells, feelings of worthlessness, disturbed sleep, weekly anxiety attacks, frequent nightmares of trauma, disturbing memories, flashbacks, and angry outbursts.  (Tr. 865).  Dr. Doyle noted that Lane reported symptoms of mania, including decreased need for sleep, increased activity, increased irritability, excessive goal directed behavior, and prolonged unbound energy.  (Tr. 865).  Lane also reported "perceived memory difficulties," problems maintaining attention, and difficulties interacting with others.  (Tr. 865).

Dr. Doyle noted that Lane made good eye contact, was cooperative, and engaged easily during the interview.  (Tr. 866).  She had normal speech and her thought process was logical, coherent, and goal directed.  (Tr. 866).  Thought content was coherent.  (Tr. 866).  She had expansive move and labile affect.  (Tr. 866).  Lane was mildly nervous, but she had no significant anxiety.  (Tr. 866).  She was fully oriented, was able to repeat three out of three words after two minutes, spelled a five-letter word backwards, and subtracted serial sevens from 100.  (Tr. 866-67).  Lane was able to follow a three-step command and written instructions, write a sentence, and understand questions and instructions without difficulty.  (Tr. 867).  "Some distractibility was observed."  (Tr. 867).  Lane had adequate insight, normal judgment, adequate common-sense abilities, and adequate decision-making abilities.  (Tr. 867).

Dr. Doyle opined that Lane did not have significant impairments in understanding, remembering, and carrying out instructions.  (Tr. 868).  She had "some difficulty maintaining attention," some difficulty in maintaining persistence and pace, and "[t]here appeared to be current limitations to perform simple tasks and multi-step tasks."  (Tr. 868).  She was not observed to have any limitations in responding appropriately to supervision and coworkers, but reporting indicated an inconsistent ability to do so.  (Tr. 868).  And Lane's reduced stress

tolerance abilities would interfere with her ability to respond appropriately to work pressures in a work setting. (Tr. 868). Dr. Doyle indicated that Lane would improve with cognitive behavioral therapy and medication management. (Tr. 869).

### 3. State Agency Consultants

On October 24, 2017, state agency psychiatric consultant Courtney Zeune, Psy.D., evaluated Lane's mental health limitations based on a review of the medical evidence. (Tr. 119-20, 125-26). Dr. Zeune determined that Lane had mild limitations in understanding, remembering, and applying information; mild limitations in interacting with others; moderate limitations in concentration, persistence, and maintaining pace; and moderate limitations in adapting and managing herself. (Tr. 120). Dr. Zeune indicated that Lane did not have understanding limitations, memory limitations, or social interaction limitations. (Tr. 125-26). She had moderate limitations in: (1) carrying out detailed instructions; (2) maintaining attention and concentration for extended periods; (3) completing a normal workday and workweek without interruptions from psychologically based symptoms; (4) performing at a consistent pace without an unreasonable number and length of rest periods; and (5) responding appropriately to changes in the work setting. (Tr. 125-26). She was not significantly limited in: (1) carrying out very short and simple instructions; (2) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; (3) sustaining an ordinary routine without special supervision; (4) working in coordination with or in proximity to others without being distracted by them; (5) making simple work-related decisions; (6) being aware of normal hazards and taking appropriate precautions; (7) traveling in unfamiliar places and using public transportation; and (8) setting realistic goals or making independent plans. (Tr. 125-26). Dr. Zeune explained that Lane was able to carry out routine, repetitive, 1-3 step tasks in a static

work setting with adequate persistence and pace.  (Tr. 126).  She needed major changes to be explained in advance and implemented gradually.  (Tr. 126).  And, although she had interaction issues in the past, her more recent observed and reported interactions were appropriate.  (Tr. 126).  On February 4, 2018, Karla Delcour, Ph.D., concurred with Dr. Zeune's assessment.  (Tr. 137-38, 142-44).

On September 8, 2017, state agency medical consultant David Knierim, MD, evaluated Lane's physical limitations based on a review of the medical evidence.  (Tr. 122-24). Dr. Knierim determined that Lane could lift up to 10 pounds frequently and 20 pounds occasionally; stand and/or walk for up to 6 hours in an 8-hour day; and sit for up to 6 hours in an 8-hour day.  (Tr. 122).  She had limited pushing and pulling in her lower extremities.  (Tr. 123). Dr. Knierim noted that Lane said she could stand and walk for 20-30 minutes at a time and needed to alternate standing/sitting to relieve leg discomfort, and those restrictions were reasonable based on the objective medical record.  (Tr. 123).  Lane could never climb ladders, ropes, or scaffolds or crawl.  (Tr. 123).  She could occasionally kneel, crouch, and climb ramps/stairs.  (Tr. 123).  And she could frequently stoop.  (Tr. 123).  She had no manipulative or visual limitations.  (Tr. 123).  She had limited hearing in both ears and needed to avoid noise over 70 dB, but her word recognition was excellent.  (Tr. 124).  She needed to avoid concentrated exposure to extreme cold, heat, and noise.  (Tr. 124).  And she needed to avoid all exposure to hazards such as machinery, heights, and commercial driving.  (Tr. 124).  On February 4, 2018, Leslie Green, MD, concurred with Dr. Knierim's opinion.  (Tr. 139-42).

### D.    Relevant Hearing Testimony

Lane testified at the ALJ hearing.  (Tr. 80-103).  Lane said that she was able to drive without limitation from her impairments.  (Tr. 82).  Lane said that she had trouble walking

because her legs would get tired and she would fall if she couldn't find a place to sit. (Tr. 95-96, 99). She also got shortness of breath when walking and used a cane for "five, six years." (Tr. 97, 99). She could walk for an hour or an hour and a half with her cane. (Tr. 99-100). She felt most comfortable sitting with her legs up or lying in her bed because her legs would swell when she was on her feet. (Tr. 100-01). Lane would go grocery shopping, but she limited herself to no more than two bags and no more than 10 pounds. (Tr. 101). She set reminders and alarms for her medications and appointments. (Tr. 101).

Lane said that she started having back trouble in 2015, and her treating doctor determined she had foramina spinal stenosis, degenerative disc disease, degenerative arthritis, spondylosis, and fatty masses. (Tr. 90). She said that her back pain radiated through her tailbone area and legs, especially when she did household chores (cooking, cleaning dishes, and laundry). (Tr. 92). Lane said that she used medication for her pain. (Tr. 92). She couldn't finish physical therapy due to her back issues, but it had helped her legs and feet. (Tr. 92). Chiropractic manipulation didn't help, and she couldn't get injections due to her blood sugar levels. (Tr. 93-94). Her right hip hurt when she would lie on it or bump into things with it. (Tr. 94). And she had pain and swelling in her feet. (Tr. 95). Lane testified that she started getting mental health counseling in October 2018 after she had become irritated and flipped a coffee table over. (Tr. 98). She said that she would beat her legs or car or something else when she got flustered. (Tr. 98). Lane said she would get depressed, wear the same clothes for days at a time, and tell people to leave her alone. (Tr. 98-99). Her counseling and medications helped "a lot." (Tr. 103).

Lane said that she worked at a food factory from 2010-2011, where she packed food into containers. (Tr. 83-84). She did not lift more than 20 pounds. (Tr. 85). She worked at Lakeview Farms for two years. (Tr. 84-85). She also worked as a fast-food worker for over two

12

years, with "a little over a year" of that time as a manager.  (Tr. 85-86).  The most she had to lift

as a fast-food worker and manager was 25 pounds.  (Tr. 87).  And she had worked as a delivery

driver for a newspaper on and off for three years, but she stopped due to the pressure on her back

and legs.  (Tr. 88-89).  Lane said that she would remember her past job duties and how to

perform them specifically.  (Tr. 102).

Charles McBee, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 103-

09).  During the course of the VE's testimony, Lane's attorney asked if any of the jobs the VE

had identified in response to the ALJ's hypothetical would be impacted if the hypothetical

individual also required a cane to stand or walk longer than 10 minutes at a time.  (Tr. 109).  The

VE said the jobs he had identified would not be impacted by such a limitation.[2]  (Tr. 109).  The

ALJ asked Lane's attorney if there was a cane prescription anywhere in the record, and Lane's

attorney said, "No, sir."  (Tr. 109).

## III.    The ALJ's Decision

On April 18, 2019, the ALJ issued a written decision denying Lane's claims.  (Tr. 15-28).

The ALJ made the following paraphrased findings relevant to Lane's arguments in this case:

> 5. Lane could perform light work, except:  She can occasionally push and pull
> with her lower extremities.  She can occasionally climb ramps and stairs.  She
> can never climb ladders, ropes, and scaffolds.  She can frequently stoop.  She can
> occasionally kneel and crouch.  She can never crawl.  She can never be exposed
> to noise levels above 70dB.  She must avoid concentrated exposure to extreme
> heat or cold.  She can never be exposed to unprotected heights, dangerous
> machinery, or commercial driving.  With respect to carrying out instructions, she
> is limited to performing simple, routine, and repetitive tasks.  There should be no
> more than occasional changes in the workplace tasks and setting, and any changes

---

[2] Here, there is some ambiguity in the record.  Lane's attorney had originally asked if any of the jobs the
VE had identified could be *performed* if a cane limitation were added.  (Tr. 108).  And the VE said "no"
in response to that question – suggesting that the jobs would *be precluded* if such a limitation were
imposed.  (Tr. 108).  The ALJ asked for clarification, and Lane's attorney said that he had asked whether
the jobs identified would have been *impacted* by a cane limitation.  (Tr. 108-09).  The VE testified that
he'd said "no" – suggesting that the jobs would *not be impacted* (or not precluded) if such a limitation
were imposed.  (Tr. 109).

should be well explained in advance.  In making this finding, the ALJ "considered all symptoms" in light of the medical and other evidence.  (Tr. 15-16).

The ALJ did not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions.  The ALJ found the state agency medical and psychological consultants' opinions persuasive because they were consistent with the medical evidence.  In particular, the psychological consultants' opinions were consistent with the consultative examiner's finding that Lane had difficulty maintaining concertation and attention.  (Tr. 24).

Dr. Doyle's opinion was persuasive because it was consistent with the fact that the claimant is able to perform simple, routine, and repetitive tasks, with no more than occasional changes.  However, some of Dr. Doyle's opinion was based upon the claimant's self-reporting that was not consistent the record.  For example, Dr. Doyle stated the claimant had significant interactional difficulties, but the claimant stated in her function report that she got along well with authority figures; had no problems with getting along with family, friends, neighbors, and others; and had never had a problem at work because of problems getting along with others.  (Tr. 25).

Lane's allegations regarding all of her symptoms were not fully supported.  There was no diagnostic imaging that supported a severe back impairment, and the physical therapy that was prescribed was after the date last insured.  There was no evidence supporting her claim that a doctor recommended she use a cane.  Lane's foot pain was diagnosed after the date last insured.  Although Lane complained of swelling, her doctors noted no edema on examination.  She said she could walk for 1 or 1.5 hours without stopping.  Her diabetes and mental health symptoms were well controlled when she was on medication.  She regularly had a normal mood and affect, and her episodes of depression and anxiety coincided with the deaths of family members.  She was not referred to counseling during the relevant period, and she did not start counseling until over a year after the date last insured.  And, despite saying she had memory problems, she testified that she would be able to remember her job duties and how to do them.  (Tr. 20-21).

Based on his findings – and VE testimony that a hypothetical individual with Lane's RFC could perform the duties of a fast-food worker – the ALJ concluded that Lane was not disabled from January 1, 2016 through September 30, 2017 and denied her claim for DIB.  (Tr. 21-23).

14

## IV.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a),

416.912(a).

### B.      Weighing of Treating Nurse Knoll's Opinion

Lane argues that the ALJ failed to apply proper legal standards in weighing nurse Knoll's

treating source opinion.  ECF Doc. 14 at 11-19.  Specifically, Lane asserts that the ALJ's reasons

for finding Knoll's opinion unpersuasive – that it was given 15 months after the date last insured,

was not consistent with medical evidence prior to the date last insured, and "there was no

evidence that an acceptable medical source prescribed a cane for ambulation, nor did any

medical provider state that she must elevate her legs" – did not comply with the regulations.

ECF Doc. 14 at 15.  Lane contends that Knoll's opinion was consistent with evidence in the

record from both before and after September 30, 2017.  ECF Doc. 14 at 15-20.  Lane argues that

the ALJ erred in failing to explain why her March 16, 2018, lumbar imaging in particular did not

support Knoll's opinion and relate back to the relevant period when medical records did not

reveal an intervening acute event responsible for the "moderate degenerative changes" revealed.

ECF Doc. 14 at 18.  Lane also asserts that the ALJ's failure to apply proper legal standards in

evaluating Knoll's opinion was not harmless because the VE testified that limitations like the

ones given in Knoll's opinion would be work preclusive.  ECF Doc. 14 at 18-19.

The Commissioner responds that the ALJ fully complied with the regulations when he

explained that Knoll's opinion was unpersuasive because it was issued well after the date last

insured and was inconsistent with evidence during the relevant period.  ECF Doc. 16 at 8-9.  The

Commissioner asserts that the record supported the ALJ's decision to discount the opinion as not

chronologically relevant when Knoll did not begin treating Lane until June 2018 (after the

September 30, 2017 date last insured) and did not state that she reviewed earlier medical records

17

in issuing her opinion.  ECF Doc. 16 at 9-10.  Further, the Commissioner argues that other evidence in the record supported the ALJ's finding that Knoll's opinion was inconsistent with medical records from the relevant period.  ECF Doc. 16 at 10-11.

In her reply brief, Lane argues that Knoll's opinion related back to the relevant period because the impairments that Knoll treated Lane for had existed prior to the date last insured.  ECF Doc. 17 at 2 (noting that the Commissioner was *correct* insofar as he stated that a "*retrospective* opinion must be supported by relevant, objective evidence during the relevant period").  Lane asserts that, because Knoll's opinion was consistent with evidence both during and after the relevant period, the ALJ was required to explain why that evidence didn't support Knoll's opinion.  ECF Doc. 17 at 2.  Lane specifically stresses that her March 2018 lumbar imaging showing moderate degenerative changes supports a finding that Knoll's opinion was consistent with her condition during the relevant period because there were no acute events that might have caused those degenerative changes.  ECF Doc. 17 at 2-3.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e).  On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The revised regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. § 404.1520c(a).  In doing so, the ALJ is required to explain how she considered the

supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

As an initial matter, we must determine whether nurse Knoll's opinion was relevant at all to the ALJ's analysis of whether Lane had a disability beginning on or before September 30, 2017.  This is because an ALJ is required to consider a medical opinion issued after the date last insured only to the extent that the limitations provided therein relate back to the period predating the last-insured date.  *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849-50 (6th Cir. 2020); *see also Jirousek v. Comm'r of Soc. Sec.*, No. 1:16-cv-1221, 2017 U.S. Dist. LEXIS 72836, at *62 (N.D. Ohio, May 12, 2017) (concluding, under the pre-March 2017 regulations, that a physician's opinion was not entitled to controlling weight when the physician's treatment relationship did not begin until after the date last insured).  Beginning with the limited relevance of post-insured period opinions in mind, the fatal stroke for Lane's challenge to the ALJ's treatment of Knoll's opinion is Knoll's failure to say anything in her three-page opinion

19

indicating whether the limitations therein were based on Lane's condition before September 30, 2017.[3]  *See* (Tr. 1365-67); *Emard*, 953 F.3d at 850 (holding that an ALJ did not err in giving "little weight" to a treating physician opinion that was issued in 2017 when the last-insured date expired in September 2015 and the opinion did not point to specific limitations during the insured period).  Simply put, because Knoll did not treat Lane until June 2018, did not issue her opinion until January 2019, and did not provide any information indicating that the functional limitations in the opinion arose on or before September 30, 2017, there is insufficient information for the court to conclude that Knoll's opinion was relevant to Lane's claim.  *See Emard*, 953 F.3d at 850 ("This principle has been repeatedly embraced by prior decisions of this court.  In *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230 (6th Cir. 1993), for instance, this court discounted evidence from a treating source offered after the date last insured where the evidence . . . contained 'no reference' to the claimant's condition during the insured period.").  And, because nothing in Knoll's opinion indicated that it related back to the relevant period, the ALJ was not required to consider it at all.  *Cf. Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 477 (6th Cir. 2018) ("Post-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date."); *Emard*, 953 F.3d at 850-51.[4]

---

[3] The only language that might give some hint as to the timeframe contemplated in Knoll's opinion is her statement that the limitations discussed therein lasted or could be expected to last for up to 12 months. *See* (Tr. 1367).  At best, this comment would support a finding that Knoll might have found these limitations present as early as January 7, 2018 (twelve months before her opinion was rendered); but that was still over three months *after* the relevant period had expired.

[4] Arguably, in light of the above discussion, the ALJ might have technically erred by not expressly discussing whether Knoll's opinion related back to the relevant period.  Nevertheless, such an error would be harmless because Lane could only benefit, and could not be prejudiced, by the ALJ's decision to consider Knoll's opinion.  *See Rabbers*, 582 F.3d at 654.

Even if, for the sake of analyzing Lane's argument, we assume that the ALJ should have considered and assigned weight to Knoll's opinion, it is quite apparent that the ALJ applied proper legal standards in doing so.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by explaining that Knoll's opinion was not persuasive because it: (1) was not issued until 15 months after the relevant period; and (2) not consistent with the medical evidence from the relevant period.  (Tr. 20); 20 C.F.R. § 404.1520c(a)-(c).  The ALJ – properly – did not defer to or give any specific weight to any source's opinions.  (Tr. 19); 20 C.F.R. § 404.1520c(a).  And, as to consistency, the ALJ explained that Knoll's opinion conflicted with both the absence of any prescription for a cane and the absence of any treatment provider's recommendation for leg elevation during the relevant period.  (Tr. 20); 20 C.F.R. § 404.1520c(b)(2).

Substantial evidence also supported the ALJ's reasons for discounting Knoll's opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  As discussed above, nothing in Knoll's opinion or the record as a whole suggested that Knoll's January 2019 opinion expressed limitations that existed on or before September 30, 2017.  *See generally* (Tr. 1365-67).  And other evidence supported the ALJ's conclusion that Knoll's opinion was inconsistent with the medical record, including: (1) Lane's hearing concession that she was never prescribed a cane; (2) Dr. Hux's treatment notes indicating that Lane had good daily activities, an ability to ambulate, no edema/tenderness, no tremors, normal mood/affect, and good hip range of motion; (3) Dr. Hux's notes stating that Lane's conditions were well controlled/stable and she had good functioning, interaction, and logic in January 2016, April 2016, January 2017, and July 2017; (4) Dr. Abdelbaki's notes that Lane had no edema, good pulses, no musculoskeletal problems, and no obvious neurological deficits in February 2016 and February 2017; (5) Lane's testimony

that she could walk for up to an hour-and-a-half, drive, and lift up to 10 pounds while grocery shopping; and (5) Dr. Knierim's and Dr. Green's opinions that Lane could lift up to 10 pounds frequently and 20 pounds occasionally, stand/walk for up to 6 hours, and sit for up to 6 hours. (Tr. 99-101, 109, 122, 139, 398, 417, 631-32, 661-62, 711, 726, 728, 741, 743, 756, 758-59, 781-82, 798, 800-01, 843, 846); *Biestek*, 139 S. Ct. at 1154. That Lane can point to evidence that could have supported a different conclusion is unavailing because: (1) most of her evidence supporting an alternate conclusion is from after the relevant period; and (2) even when a preponderance of evidence supports her claim that isn't enough to overcome an ALJ decision that was supported by substantial evidence. *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

Because the ALJ applied proper legal standards and reasonably drew his conclusions from the evidence in the record, the ALJ's decision to discount Knoll's opinion fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Mullen*, 800 F.2d at 545; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783. Accordingly, I recommend that the court AFFIRM the ALJ's conclusion that Knoll's opinion was unpersuasive.

### C.    Incorporation of Dr. Doyle's Opinion Into RFC

Lane argues that the ALJ improperly failed to incorporate into the RFC limitations from Dr. Doyle's opinion after he found the opinion persuasive. ECF Doc. 14 at 21-24; *see also* ECF Doc. 17 at 3-4. Specifically, Lane asserts that the ALJ did not explain why he found her able to perform simple, routine, and repetitive tasks when Dr. Doyle had concluded she "would have limitations performing even simple tasks." ECF Doc. 14 at 22; *see also* ECF Doc. 17 at 3-4. Lane asserts that other evidence in the record supported Dr. Doyle's assessment, and that the ALJ's statement that her opinion was based on Lane's self-reporting was not a good reason for

22

discounting the opinion or not adopting its limitations.  ECF Doc. 14 at 22-23.  Lane asserts that

the failure to incorporate into the RFC Dr. Doyle's less than simple-tasks limitation was not

harmless because the limitation would have been work-preclusive.  ECF Doc. 14 at 24.

The Commissioner responds that the ALJ properly evaluated Dr. Doyle's opinion by

explaining what parts of the opinion he found persuasive or unpersuasive and why.  ECF Doc. 16

at 11-12.  The Commissioner argues that the ALJ was not required to explain why he adopted

some limitations and not others, and Lane has not shown his decision to do so was unreasonable.

ECF Doc. 16 at 12.

Even when an ALJ finds a medical source's opinion persuasive or consistent and

well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations

wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015)

(unpublished).  So long as the ALJ's RFC determination considered the entire record, the ALJ is

permitted to make necessary decisions about which medical findings to credit and which to reject

in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587

(6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary

decisions about which medical findings to credit, and which to reject.  Contrary to [the

claimant's] contention, the ALJ had the authority to make these determinations.").  However, an

ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict

between the functional limitations described in a medical opinion and the ALJ's RFC finding, or

explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No.

5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715, at *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r

of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer*, 774 F. Supp. 2d at 881

(stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

It appears that Lane has misconstrued Dr. Doyle's opinion, and it is easy to understand why.  Initially, I note that Dr. Doyle never stated that Lane "would have limitations performing even simple tasks," as Lane contends.  *See generally* (Tr. 862-69); ECF Doc. 14 at 22.  Dr. Doyle said that "[t]here appeared to be current limitations to perform simple tasks and multi-step tasks, such a[s] activities of daily living."  (Tr. 868).  Read in isolation, this is somewhat ambiguous.  Could Dr. Doyle have meant that Lane could not perform simple and multi-step tasks?  Without context, it could be taken that way.  However, the opinion appeared one page after Doyle summarized all the daily living and multi-step activities Lane told Doyle she could do.  Therefore, read in the context of the whole report, we must conclude that Dr. Doyle's statement to mean that Lane *could* perform "simple tasks and multi-step tasks, such a[s] activities of daily living" but appeared unable to perform more complex tasks at the time of her consultative examination.  (Tr. 868).

This interpretation makes sense because Dr. Doyle had determined that Lane had some difficulty in maintaining attention, persistence, and pace, but also: (1) determined that Lane did not have significant impairments in understanding, remembering, and carrying out instructions; and (2) observed that Lane was able to follow three-step commands, follow written instructions, and understand questions and instructions without difficulty.  (Tr. 867-68).  And the ALJ's statement that Dr. Doyle's opinion was "consistent with the fact that [Lane was] able to perform simple, routine, and repetitive tasks, with no more than occasional changes" demonstrates that the ALJ correctly translated Dr. Doyle's opinion into the RFC findings.  (Tr. 15-16, 20).

In any event, the ALJ did not improperly cherry-pick limitations from Dr. Doyle's opinion.  *Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881; *Rogers*, 2018 U.S. Dist. LEXIS 68715, at *44.  Instead, the ALJ expressly stated which portions of Dr. Doyle's opinion he found persuasive (*i.e.*, the limitation to simple tasks) and which portions he didn't find persuasive (*i.e.*, the opinion that Lane had significant interaction limitations[5]).  (Tr. 20).  The ALJ adequately explained that Dr. Doyle's simple-tasks limitation was consistent with the record, whereas the interaction limitation was not consistent with the record.  (Tr. 20).  And the ALJ went on to adopt the simple-tasks limitation into the RFC, but not the interaction limitation.  (Tr. 15-16).  The ALJ was allowed to do that.  *Justice*, 515 F. App'x at 587; *Reeves*, 618 F. App'x at 275.  The explanations he gave were all that the regulations required.  20 C.F.R. § 404.1520c.  And there was no inconsistency between the RFC finding and the explanation of how he treated Dr. Doyle's opinion.  *Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881; *Rogers*, 2018 U.S. Dist. LEXIS 68715, at *44.

Even accepting Lane's position that Dr. Doyle's reliance on self-reporting was not a good reason to discount her opinion, *see* (Tr. 20); *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) ("The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology."), any error in doing so was harmless at worst, *Bowen*, 478 F.3d at 746; *Rabbers*, 582 F.3d at 654.  This is because the ALJ's conclusion that portions of Dr. Doyle's opinion were inconsistent with other evidence in the record could have independently supported the ALJ's finding that those parts of Dr. Doyle's opinion were

---

[5] Lane *does not* challenge the ALJ's decision not to incorporate the interaction limitation into the RFC, but *only* challenges what she has (incorrectly) perceived as the ALJ's failure to incorporate a simple-tasks limitation into the RFC.  *See generally* ECF Doc. 14 at 21-24.  Thus, any challenge to the ALJ's decision not to incorporate the interaction limitation (or any other limitations) from Dr. Doyle's opinion into the RFC is arguably forfeited.  *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010).  Nevertheless, I have addressed this portion of the ALJ's decision above.

unpersuasive.  *See* 20 C.F.R. § 404.1520c(c)(2) (consistency as a regulatory factor affecting persuasiveness).  Thus, Lane cannot show that – absent the ALJ's commentary on self-reporting – the outcome would have been any different.  *Rabbers*, 582 F.3d at 654 (An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless.); *see also NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969) (Courts are not required to "convert judicial review of agency action into a ping-pong game.").

Substantial evidence also supported the ALJ's treatment of Dr. Doyle's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ's decision to *adopt* Dr. Doyle's simple-tasks limitation was supported by: (1) Dr. Doyle's observations and conclusions that Lane could understand, remember, and carry out instructions, including up to three steps; (2) Dr. Zeune's and Dr. Delcour's opinions that Lane did not have understanding or memory limitations, could carry out very short and simple instructions, and was able to perform repetitive 1-3 step tasks in a static work setting; and (3) Lane's own testimony that she was able to remember her past job duties and how to perform them.  (Tr. 102, 125-26, 142-44, 866-68); *Biestek*, 139 S. Ct. at 1154. And the ALJ's finding that Dr. Doyle's interaction limitation was inconsistent with the record was supported by: (1) Lane's own examination statements that she was able to get along with her supervisors and coworkers; (2) Dr. Doyle's observations that Lane was cooperative and engaged easily during the interview; and (3) Dr. Zeune's and Dr. Delcour's opinions that Lane did not have social interaction limitations.  (Tr. 125-26, 142-44, 863-64, 866); *Biestek*, 139 S. Ct. at 1154.  Thus, because the ALJ's reasons for treating Dr. Doyle's opinion the way he did were supported by substantial evidence, the ALJ's treatment of Dr. Doyle's opinion fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.

Accordingly, I recommend that the court AFFIRM the ALJ's treatment of Dr. Doyle's opinion.

## V.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Lane's application for DIB be AFFIRMED.

Dated: May 24, 2021

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).